UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60011-CR-ROSENBAUM/Snow

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ANDRE D. BARBARY, et al.,

      Defendants.

_____

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court on Defendant **Andre Barbary's** Motion to Suppress Conversations Recorded Pursuant to a Title III Wiretap on Telephone Number (786) 367-9026 (DE 247), **adopted** by Defendants **Nathaniel Holt, Jr., Tamika Jasper-Barbary, Monica Lewis, Scott W. Barnes and Robert Jackson**, and Defendant **Tamika L. Jasper-Barbary's** Motion to Suppress Conversations Recorded Pursuant to a Title III Wiretap on Telephone Number (786) 367-9026 (DE 220), **adopted** by Defendant **Robert Jackson**, which were referred to United States Magistrate Judge, Lurana S. Snow, for Report and Recommendation. Both motions seek to suppress two conversations between Defendant Andre Barbary (hereinafter "Barbary") and Defendant Tamika Jasper-Barbary (hereinafter "Jasper-Barbary") based on the alleged failure to minimize privileged communications. Defendant Barbary also argues that the wiretap application failed to meet the "necessity" requirement.

      The motions are fully briefed and an evidentiary hearing was held on both motions on July 17, 2012. They are ripe for consideration by the Court.

# I. BACKGROUND

All Defendants are charged by Indictment with conspiracy to distribute and to possess with intent to distribute oxycodone and five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) (Count One) and conspiracy to use telephone and cellular telephone facilities to commit drug felonies, in violation of 21 U.S.C. §§ 846 and 843(b) (Count Two). Defendant Tamika L. Jasper-Barbary also is charged with obstruction of justice by disclosing that L.B. was likely to provide information to a Federal Grand Jury, in violation of 18 U.S.C. § 1503 (Count Three). It is undisputed that Barbary and Jasper-Barbary are husband and wife, and that during the time period of the Indictment, Jasper-Barbary worked for the United States Attorney for the Southern District of Florida in the Miami Grand Jury Suite.

In August 2011, United States District Judge Donald M. Middlebrooks authorized the wire and electronic interception of cellular telephones utilized by Defendant Barbary. The wiretap authorization was based upon the Affidavit of DEA Special Agent Amber Sargent, which states, in pertinent part:

> Any interception involving potentially privileged communications will be minimized (if BARBARY and JASPER-BARBARY are engaging in conspiratorial communications, then the interception will not be minimized as no privilege exists. Monitors will spot monitor to determine whether BARBARY and his wife are engaging in communications regarding Title 21 or Title 18 offenses).

(DE 278-1 at p. 108, ¶ 243)

> Regarding necessity, Agent Sargent's Affidavit states:

> All normal avenues of investigation have been carefully evaluated for use or have been attempted with minimal results, as will be explained below. These include seizures, the use of confidential sources, controlled purchases, consensual recordings, physical surveillance, trash pulls, analyzing toll and pen register data, seeking arrest warrants and search warrants, interviewing target subjects or other associates, and the use of federal grand jury subpoenas. The requested authorization for wire and electronic interception is necessary because several of these normal investigative techniques have been tried and have not resulted in sufficient evidence to prosecute all the participants in the criminal enterprise, and other

2

> techniques appear unlikely to produce the needed results if attempted
> or utilized further, or they are too dangerous to employ, as described
> below.

Id. at p. 93, ¶ 216.

The affidavit goes on to discuss in great detail the difficulties encountered and/or problems associated with other investigative techniques, such as seizures; confidential sources and cooperating defendants; physical, video and electronic surveillance; trash pulls and pen register analysis; grand jury investigation; interviews; search warrants, and arrest warrants.  Id. at pp. 94-107, ¶¶ 218-241.

Judge Middlebrooks' Authorization Order specifically found probable cause to believe that Barbary and Jasper-Barbary had committed, were committing and would continue to commit Title 21 and Title 18 offenses.  (DE 278-2 at pp. 1-2)  Judge Middlebrooks also found that normal investigative techniques either had been tried with limited success or had failed to yield the evidence sought, or reasonably appeared unlikely to succeed or would have been too dangerous if tried.  Id. at pp. 3-4.  Regarding minimization, the Order stated, in pertinent part:

> Monitoring of wire communications must terminate immediately
> when it is determined that the conversation is unrelated to
> communications subject to interception. . . . If the conversation is
> minimized, the monitoring agent shall spot check to ensure that the
> conversation has not turned to criminal matters.  Special attention
> shall be given to minimize all potentially privileged communications
> (though privilege does not exist upon furtherance of criminal
> conduct).

Id. at p. 8)

The conversations which Defendants Barbary and Jasper-Barbary seek to suppress are calls between them, numbered 17596 and 17832.  Call #17596 was an incoming call from Jasper-Barbary at 7:11 a.m. on September 23, 2012.  The linesheet reflects that the call was minimized for 30 seconds after 2 minutes of listening had revealed nothing pertinent.  After interception was resumed, Jasper-Barbary stated that she had been sweating so much the previous night that the bed was all wet.  Then the following exchange took place:

Jasper-Barbary: Alright.  They was supposed to be doing something in Opa Locka and Overtown.

Barbary: Who?

Jasper-Barbary: Inaudible.

Barbary: Gangstas?

Jasper-Barbary: Uh huh

Barbary: God damn.

Jasper-Barbary: This morning.  He was saying he had to be up at 4:00 in the morning.  [Chuckles]

Barbary: Who said that?

Jasper-Barbary: One of the agents.

Barbary: Alright. . . [long pause] . . . alright later.

(DE 269-2 at 32)

The second call, #17832, occurred at 6:03 p.m., also on September 23, 2011.  The linesheet indicates that the call was minimized for 30 seconds after 2 minutes of non-pertinent conversation. When interception was resumed, the following conversation ensued:

Barbary: Did they do they thang?

Jasper-Barbary: Uh, I think so, I seen a bunch of, um, black young people down there I guess looking for their people.

Barbary: Oh yeah? I ain't hear nothin yet.  I'm gonna hit one of my main man to make sure he is safe.

Jasper-Barbary: [Laughs]

Jasper-Barbary: Um hmm

Jasper-Barbary: [Inaudible] a high speed chase on 95 yesterday.

Barbary: Yeah they called me to bond the dude out.

Jasper-Barbary: [Laughs]

Barbary: [Inaudible]

4

Jasper-Barbary: Nah, she was just hollerin to um tell you don't go on 95 or somethin.

Barbary: [Inaudible]

Jasper-Barbary: Huh?

Barbary: I say he is some kin of dirt, him.

Jasper-Barbary: Oh. . . yeah.

Barbary: Alright, I'll let  you know, I'll call you when I get in.

(DE 269-2 at 33)

## II. <u>EVIDENCE PRESENTED</u>

The sole witness at the evidentiary hearing was DEA Special Agent Amber Sargent. Agent Sargent testified that she has been an agent with DEA for six years.  She stated that the investigation which gave rise to the Instant Indictment revealed that Barbary and Jasper-Barbary had been together as a couple for many years, and were married in 2010.  Agent Sargent identified Government's Exhibit 1, the minimization section of her Affidavit in Support of Application for Interception of Wire and Electronic Communications, and Government's Exhibit 2, Judge Middlebrooks' Order Authorizing the Interception of Wire and Electronic Communications.

Agent Sargent testified that on August 24, 2011, there was a full briefing of all wiretap monitors.  The agent identified the Guidelines for the Conduct of Wire & Electronic Surveillance, describing what to do if the nature of a conversation was unclear (Government's Exhibit 3) and the Minimization Instructions given to all monitors (Government's Exhibit 4).  She pointed out that paragraph 5 of Exhibit 4 instructed monitors to listen to a conversation for 2 minutes to ascertain whether criminal activities were being discussed; paragraph 6 noted that the time needed for this determination will vary as the monitors gain experience, and paragraph 7(d) discussed the marital privilege and the fact that the presence of a third person during the conversation destroys the privilege.  Agent Sargent stated that the procedure was for a monitor to listen to the conversation for 2 minutes; if the conversation proved non-pertinent during the first 2 minutes, the monitor would

5

return to the call every 30 seconds to ascertain whether the conversation had become pertinent.  She added that this is the procedure followed by DEA for all wiretaps.

Agent Sargent testified that the wiretap continued for 140 days.  She related that Call #117596 occurred 30 days into the wiretap.  On September 22, 2011 (the day before both of the subject calls), an undercover DEA agent was sent to the U.S. Attorney's Office to confirm that Jasper-Barbary was relaying sensitive grand jury information to Barbary.  Therefore, there was a heightened reason to monitor conversations between them on September 23, 2011.  Agent Sargent, who monitored both of the subject calls, identified Government's Exhibits 7a and 7b, which were screen shots of the computer taken after each of the calls.  They reflect that both calls were monitored for 2 minutes, then spot monitored after 30 seconds had elapsed.  After 30 seconds, when she resumed listening to spot monitor each of the two calls, each became pertinent within the 30-second spot monitor time period.  Agent Sargent identified Government's Exhibits 8a and 8b, which are transcripts of Call #s 117596 and 117832.  She explained that she believed that the first of the two subject calls became pertinent within 24 seconds of the 30-second spot monitor, when Jasper-Barbary stated that she had sweated so much the preceding night.  Agent Sargent believed that Jasper-Barbary had been sweating because a search warrant was being executed  in an area of Opa Locka where Jasper-Barbary owned property.  Agent Sargent believed that the second of the two calls was pertinent as a follow-up to the first, with Barbary stating that he had to check on the "main man."

On cross examination, Agent Sargent testified that the Guidelines instructed monitors to listen for 2 minutes, minimize for 30 seconds, then listen for 30 seconds.  Agent Sargent did not believe that she had to minimize a conversation before the first 2 minutes had elapsed, even if the initial portion of the conversation was non-pertinent.  Agent Sargent also did not believe that the marital privilege applied to Barbary and Jasper-Barbary because they were co-conspirators.  She conceded that prior to September 23, 2011, there had been no conversations between Barbary and

Jasper-Barbary about possessing illegal drugs, although there had been many non-pertinent conversations between them.

Agent Sargent also testified that the rules for minimization did not change as a result of the undercover operation on September 22, 2011.  She stated that although the undercover agent went into the U.S. Attorney's Office at about 12:30 p.m. on that date, there were no conversations between Barbary and Jasper-Barbary until the following morning.  Agent Sargent reiterated that during the first conversation, she believed that Jasper-Barbary was sweating because she was nervous about the raid.  The agent acknowledged that 1 minute at 29 seconds after the time of minimization had elapsed before Jasper-Barbary actually mentioned the raid.  As to the other call, it became pertinent within 5 seconds of the 30-second spot monitoring.  If Agent Sargent had minimized the call sooner (before the first 2 minutes, during which the conversation was non-pertinent) or for longer, she would have missed the pertinent portion.

On redirect examination, Agent Sargent pointed out that non-pertinent conversations can turn criminal very quickly, and that some time is needed to ascertain whether the topic is going to change.  She also noted that there were other pertinent calls between Barbary and Jasper-Barbary, including discussions of a shooting and of surveillance by law enforcement of Barbary.  Agent Sargent explained that offenders often use slang and code, and that they rarely explicitly discuss drug dealing or obstruction of justice.

Agent Sargent testified that on September 23, 2011, monitoring was shut down between midnight and 6am.  The usual procedure was to monitor calls between 8 am and midnight.  She also stated that during the second of the two subject calls, Jasper-Barbary's sister was present.

Government Exhibit 8a reflects that when the call resumed after the 30-second minimization period in Call #17596, and immediately prior to the segment quoted above, the following exchange occurred:

Jasper-Barbary: [Moans]

Barbary: But I ain't really been playin.

Jasper-Barbary: [Moans]

Jasper-Barbary: I sweat so much last night.

Barbary: Huh?

Jasper-Barbary: I said I sweated so much last night.

Barbary: Why?

Jasper-Barbary: I don't know.

Barbary: You have the air down?

Jasper-Barbary: Mmm hmmm.

Barbary: Alright.

Jasper-Barbary: I don't know what, but my tank was wet, everywhere was wet, the bottom of the bed [U/I]

Barbary: [U/I]

Jasper-Barbary: Like the bed was wet too.

Barbary: So you had the whole bed to yourself and you still sweated like that? Why didn't you take the cover off you?

Jasper-Barbary: I don't know.

Jasper-Barbary: I don't know.

Jasper-Barbary: [Moans]

### III. DISCUSSION

#### A. Minimization

The Defendants argue that the two calls in question were not properly minimized, particularly in view of the fact that they were between husband and wife. At the evidentiary hearing, counsel suggested that the initial listening period of 2 minutes on each call was too long, and that the first call should have been minimized a second time after 30 seconds because Jasper-Barbary's

mention of sweating the preceding night clearly referred to malfunctioning air conditioner. Counsel also emphasized that Agent Sargent obviously misunderstood the applicable law, since she stated her belief that the marital privilege did not apply to Barbary and Jasper-Barbary because they were co-conspirators.

The leading case on the minimization requirement is <u>Scott v. United States</u>, 436 U.S. 128 (1978). In that case, the wiretap monitors made no effort whatsoever to minimize the recording of intercepted conversations, despite the fact that only 40% of those calls were criminal in nature. The Supreme Court refused to order suppression of the tape recorded conversations sought to be introduced by the Government. In so holding, the Court discussed the purpose of the minimization requirement, and the standards to be applied in determining whether this requirement has been met.

The Court first noted that 18 U.S.C. § 2518(5), the section of the wiretapping statute requiring minimization, "does not forbid the interception of all nonrelevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." <u>Id.</u> at 139-140. Whether the monitors have complied with this directive depends on the facts and circumstances of each case, and "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer." <u>Id.</u> at 140. In evaluating the minimization efforts, a reviewing court should:

> . . . . consider the circumstances of the wiretap. For example, when the investigation is focusing on what is thought to be a wide-spread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators. The type of use to which the telephone is normally put may also have some bearing on the extent of minimization required.

<u>Id.</u>

The Court went on to point out:

> Other factors may also play a significant part in a particular case. For example, it may be important to determine at exactly what point during the authorized period the interception was made. During the

> early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter. . . . Other situations may arise where patterns of nonpertinent calls do not appear.  In these circumstances it may not be unreasonable to intercept almost every short conversation because the determination of relevancy cannot be made before the call is completed.

Id. at 141.

The Court determined that the case before it involved the investigation of a "wide-ranging conspiracy with a large number of participants."  Forty percent of the intercepted calls clearly were narcotics-related, and many of the remaining calls were very short.  The Court concluded that in such a case, "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed."  Id. at 142.  Under these circumstances, the failure of the monitors to minimize at all were deemed justified.

In United States v. Hyde, 574 F.2d 856, 869 (5th Cir. 1978), the Court held that "three factors must be considered in determining whether attempts to minimize were reasonable:  "(1) the nature and scope of the criminal enterprise under investigation, (2) the Government's reasonable inference of the character of a conversation from the parties to it and (3) the extent of judicial supervision."  Where agents are investigating a widespread conspiracy, it is appropriate to monitor calls more extensively than in a simpler case.

In the instant case, the undersigned finds that the testimony of Agent Sargent was fully credible.  She testified that she followed the  monitors' prescribed procedure of listening for 2 minutes, then minimizing for 30 seconds, followed by a spot monitor of 30 seconds.  This procedure was reasonable and fully compliant with the requirements of § 2518(5).  Regarding the initial listening period of 2 minutes, this Circuit has held that "[c]onversations lasting less than two minutes are considered too brief 'to identify the caller and characterize the conversation as merely social or possibly tainted.'"  United States v. De La Cruz Suarez, 601 F.3d 1202, 1215 (11th Cir. 2010) (quoting United States v. Bynum, 485 F.2d 490, 500 (2d Cir. 1973).  The undersigned finds that the 30 second minimization period was equally reasonable.  As Agent Sargent pointed out, the calls

frequently shifted rapidly from non-pertinent to criminal in nature, and a longer minimization interval would have resulted in missed pertinent conversations.

There is no reason why this procedure should not have been followed during conversations between Barbary and Jasper-Barbary. Although Agent Sargent mistakenly believed that the marital privilege did not apply to them because they were co-conspirators, this error had no practical effect, because "the marital privilege does not protect those conversations made in furtherance of a conspiracy." United States v. Malekzadeh, 855 F.2d 1492, 1496 (11th Cir. 1988). Therefore, the minimization requirement of minimizing non-pertinent calls sufficed to protect the marital privilege, which applied only to conversations which were not criminal in nature.

Finally, the undersigned finds that Agent Sargent reasonably believed that Jasper-Barbary's reference to sweating the night before was a reference to her nervousness rather than to a malfunctioning air conditioner. This Court must undertake "an objective assessment of an officer's actions in light of the facts and circumstances then known to him." Scott, 436 U.S. at 137. Agent Sargent knew that an undercover agent had relayed information to Jasper-Barbary regarding a raid the preceding night which could adversely affect her interests and those of her husband. Under those circumstances, Agent Sargent's interpretation was reasonable, as was her decision to continue listening for a short time past the 30-second sport monitoring period, when the call clearly became pertinent.

Accordingly, the undersigned concludes that neither of the subject calls identified by the Defendants should be suppressed for failure to minimize.

**B. Necessity**

Defendants Barbary and Robert Jackson argue that the Government's wiretap application failed to establish "necessity." The federal wiretapping statutes require the application for such monitoring to include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried

or to be too dangerous."  18 U.S.C. § 2518(1)(c).  Prior to entering an order authorizing the interception, the judge must determine on the basis of these facts that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c).  According to the Defendants, prior to seeking a wiretap order, the Government could have utilized alternative techniques, such as physical surveillance, trash pulls, confidential informants (used in a proactive manner) and search warrants.

The necessity requirement is designed to ensure that wiretaps are not utilized in routine investigations where less intrusive methods would suffice.  However, the courts have interpreted this requirement in a common-sense fashion, and have held that wiretaps need not be utilized only as a last resort.  United States v. Cifarelli, 589 F.2d 180, 183 (5th Cir. 1979); United States v. Hyde, 574 F.2d 856 (5th Cir. 1978).  The affidavit in support of a wiretap application need not exclude the possibility of every conceivable investigative technique.  United States v. Alonso, 740 F.2d 826, 868 (11th Cir.), cert. denied 105 S.Ct. 928 (1985).  Rather, "[i]t is enough if the affidavit explains the prospective or retroactive failure of several investigative techniques that reasonably suggest themselves," and a wiretap order will not be overturned "simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not."  Hyde, 574 F.2d at 867.

In the instant case, the Affidavit of Agent Sargent addresses in detail each of the other techniques suggested by the Defendants, and states why they failed or were likely to fail to achieve the objectives of the investigation.  Confidential informants had been utilized, but had been unable to make controlled drug purchases from the Barbary organization and, even if they had been successful, these purchases would not have resulted in the identification of all of the organization's members or their method of operation.  (DE 278-1 at 95-97)  Physical surveillance had met with limited success because the targets were sophisticated drug traffickers and employed measures of evasion and counter-surveillance.  Id. at 98-100.  Trash pulls were difficult because law enforcement

12

agents would be identified as outsiders in the neighborhoods where the targets reside and would be of limited use in explaining the large scale interstate nature of the organization.  Id. at 100-102. Finally, although one search warrant had been executed, there was insufficient probable cause to search the residences of several members of the organization.  Moreover, agents feared that the execution of search warrants at some locations would result in the destruction of evidence at others. Id. at 104-105. The Government also explained the inadequacy of other methods, such as use of asset seizures, undercover agents, toll and pen register analysis, grand jury subpoenas, interviews and arrest warrants.  Id. at 94-95, 98, 102-07.

The undersigned finds that the wiretap applications more than adequately described what other investigative procedures have been tried and failed or why they reasonably appeared to be unlikely to succeed if tried or to be too dangerous, as required by the statute.  Accordingly, the intercepted conversations should not be suppressed based on failure to comply with the necessity requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c).

## IV. CONCLUSION

This Court having considered carefully the pleadings, arguments of counsel, and the applicable case law, it is hereby

RECOMMENDED that:

1.   Defendant **Andre Barbary's** Motion to Suppress Conversations Recorded Pursuant to a Title III Wiretap on Telephone Number (786) 367-9026 (DE 247), **adopted** by Defendants **Nathaniel Holt, Jr., Tamika Jasper-Barbary, Monica Lewis, Scott W. Barnes and Robert Jackson** be DENIED, and

2.   Defendant **Tamika L. Jasper-Barbary's** Motion to Suppress Conversations Recorded Pursuant to a Title III Wiretap on Telephone Number (786) 367-9026 (DE 220), **adopted** by Defendant **Robert Jackson** be DENIED.

The parties will have 14 days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with The Honorable Robin S. Rosenbaum, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal factual findings contained herein.  LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

DONE AND SUBMITTED at Fort Lauderdale, Florida, this 6th day of September, 2012.

LURANA S. SNOW
UNITED STATES MAGISTRATE JUDGE

Copies to:

All Counsel of Record